Michael A. **BARFIELD**,
Plaintiff–Appellant,

v.

David **BRIERTON**, Louis Carmichael, Richard Dugger, Thomas Barton, David E. Watson, Jerry C. Wade, Randall R. Music, John Shaw, Defendants–Appellees.

No. 88–3131.

United States Court of Appeals,
Eleventh Circuit.

Sept. 15, 1989.

---

Michael A. Barfield, Altamonte Springs, Fla., pro se.

John C. Willis, IV, Taraska, Grower, Unger & Ketcham, P.A., Orlando, Fla., for defendants-appellees.

Before FAY and HATCHETT, Circuit Judges, and HOFFMAN,* Senior District Judge.

FAY, Circuit Judge:

The plaintiff-appellant, Michael A. Barfield, appeals the district court's order granting summary judgment in favor of the defendants-appellees, several members of the Florida Department of Corrections. Barfield was a prisoner in the Florida correctional system. He brought this action pursuant to 42 U.S.C. § 1983 (1982) alleging that the defendants violated his constitutional rights by: 1) transferring him to Florida State Prison, an adult prison facility, in violation of his liberty interest as a youthful offender to remain incarcerated at designated youthful offender facilities; 2) denying him access to the courts, legal counsel, law library and United States mail services while at Florida State Prison; and 3) denying him medical assistance and treatment at the state prison in violation of

the eighth amendment prohibition against cruel and unusual punishment. In granting summary judgment, the district court noted that the plaintiff failed to respond timely to the defendants' motion. Notwithstanding the timeliness issue, the district court examined the merits of the summary judgment motion and ruled that Barfield failed to present genuine issues of material fact regarding his various allegations against the prison officials. Viewing the evidence in the light most favorable to the plaintiff, we find that the evidence presented establishes genuine issues of material fact as to whether Barfield possessed a liberty interest by virtue of his youthful offender status and whether the prison officials unconstitutionally denied him access to the courts and to medical treatment. Thus, we reverse the district court's grant of summary judgment and hold that a triable issue exists regarding whether the defendants' conduct violated the plaintiff's rights under § 1983.

I. FACTUAL BACKGROUND

The plaintiff, Michael A. Barfield, was incarcerated in the State of Florida prison facilities.[1] He was originally convicted in September 1982 for passing worthless checks, and was placed in the custody of the Florida Department of Corrections ("D.O.C."). On October 28, 1982, he was committed to the Reception and Medical Center in Lake Butler, Florida. The plaintiff claims that a state trial judge sentenced him to a three year prison term as a twenty-year-old youthful offender pursuant to Fla. Stat. § 958.011–958.15 (1985). Barfield also states that the D.O.C. classified him as a youthful offender upon his commitment to the correctional system. See (R4–73, Ex. B). The defendants however, contend that the plaintiff was never sentenced as a youthful offender, but merely classified as such by the D.O.C. in its

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. The record does not indicate Barfield's current status. However, documents filed with this court by the defendants in May 1989 show that Barfield was served the legal papers at a street address and not in prison. Barfield also argued his own appeal at oral argument. We assume, therefore, that he has been released from prison.

Youthful Offender Declaration. *See* (R3–72, Exs. A; C).

On November 23, 1982, Barfield was transferred from Lake Butler to Baker Correctional Institution in Olustee, Florida to begin his prison term. Later, on June 10, 1983, he was transferred from Baker to Cross City Correctional Institution. The defendants maintain that upon this transfer, Barfield's classification as a D.O.C. youthful offender was removed. *See* (R3–72, Exs. A, p. 6; C, p. 2). The plaintiff however, argues that his youthful offender status was never removed and that his D.O.C. Youthful Offender Declaration confirms this.[2] *See* (R4–73, Ex. B).

While incarcerated at Baker and Cross City, Barfield cooperated with the Federal Bureau of Investigation and Naval Intelligence in a federal investigation centering on his possession of national security information. Barfield had been in the Navy and had held a sensitive position while there, working with computer equipment. Foreign agents allegedly contacted Barfield requesting that he pass on to them information he had obtained while in the Navy and while dating a female Naval Intelligence officer. On July 26, 1983, at Cross City, the FBI and Naval Intelligence interrogated Barfield. Later that month, Defendant David H. Brierton, Inspector General of the Florida Department of Corrections, received a telephone call from an FBI special agent regarding Barfield's involvement in national security matters. On July 29, 1983, Brierton met with the FBI's special agents C. Douglas Jones and William C. Arms at Union Correctional Institution, Raiford, Florida to discuss the investigation of the plaintiff.

According to Brierton, the FBI stated at the meeting that Barfield was a threat to national security, and that the Bureau wanted him placed in the most secure environment within the Florida correctional system pending a federal grand jury indictment within thirty to sixty days. *See* (R3–72, Ex. A3, pp. 15–19). Brierton also said in his deposition that the FBI requested that the plaintiff's communication with the outside world be completely severed to prevent him from communicating with any foreign agents. *See* (R3–72, Ex. A3, pp. 20, 70–71). Based on these representations, Brierton transferred the plaintiff from Cross City to Florida State Prison on July 29, 1983 where he was initially housed on Q Wing, a management cellblock, of the prison's Death Row. Barfield remained in this cell from July 29, 1983 until August 24, 1983 when he was transferred to the prison infirmary. *See* (R3–72, Ex. G, pp. 2–3). He was housed in a cell in the infirmary until October 6, 1983.

The plaintiff states that while incarcerated at Florida State Prison, he was subjected to psychological torture and violent physical and sexual assaults on repeated occasions. According to Barfield, several prison officials taunted and harassed him in his cell located near the electric chair, including issuing threats that he was scheduled to have his head shaved in preparation for electrocution, and that he would eat his last meal shortly. *See* (R4–90, Ex. F, p. 96 of 12/4/87 depo.).[3] Barfield also states that he was raped numerous times

---

**2.** The D.O.C. Youthful Offender Declaration requires that certain corrections officials affirmatively act to remove an inmate's youthful offender status. The lower portion of the form provides: "YOUTHFUL OFFENDER DECLARATION REMOVED–Youthful Offender facility removing declaration shall complete this form in the Inmate record upon transfer and forward a copy to the Youthful Offender Program Office in the Central Office. This may only occur after transfer has been approved by the Central Office." We consider especially the portion of the form that reads: "NOTE: The Youthful Offender Declaration will not be removed until bottom portion completed and filed.'" Our review of the entire record fails to reveal any evidence

that this section was ever completed by the D.O.C. officials.

**3.** On one occasion, three prison officials entered Barfield's cell under the pretext of escorting him to the prison barber. Barfield crawled under his bunk in the cell to avoid the guards, but they grabbed at him and kicked him. After a period of fighting and screaming, the officials finally left the cell. *See* (R4–90, Ex. F, pp. 96–97 of 12/4/87 depo.). On several other occasions, Barfield claims that the prison officials caused the lights in his cell to flicker on and off repeatedly, presumably in simulation of the electrical surge caused by use of the electric chair. *Id.* at 90–91.

by another inmate who had access to his cell. The inmate carried a broom and mop bucket for sweeping out the cells, and entered Barfield's with a key. The violent attacks then ensued. *Id.* at 107–111. Barfield maintains that he requested medical treatment subsequent to the assaults, but the corrections officials ignored or denied his requests. *Id.* at 111–116. He also claims that while he was at the prison, he was not permitted access to the courts nor permitted any chance to communicate with the outside world. The defendants however, deny each of these allegations.

Approximately thirty days after the plaintiff was transferred to Florida State Prison, Brierton contacted the FBI concerning the status of the federal indictment and was assured that the matter was proceeding forward. After sixty days, Brierton attempted to contact the FBI several times but was unsuccessful. He then authorized the plaintiff's transfer to the Reception and Medical Center at Lake Butler Correctional Institution on October 6, 1983. *See* (R3–72, Ex. A, p. 5). The plaintiff was never indicted by a federal grand jury.

## II. PROCEDURAL BACKGROUND

This appeal raises several questions concerning jurisdiction and the timely filing of motions. We therefore, carefully set out the procedural history of the case. On September 12, 1986, Barfield filed a civil rights complaint against several members of the Florida D.O.C. in the United States District Court for the Middle District of Florida, alleging violations of his constitutional rights under § 1983. *See* (R1–1). He filed his first amended complaint on March 9, 1987, naming additional defendants. The defendants answered the complaint on April 2, 1987. On May 22, 1987, the district court entered an order setting the action for jury trial and establishing deadlines for the completion of discovery. The trial was set for November 20, 1987, with all discovery to be completed by September 21, 1987.

On September 4, 1987, the defendants filed a motion to continue the trial or, in the alternative, to extend discovery and pre-trial motion deadlines. The plaintiff also filed a motion to continue the trial on September 22, 1987. Accordingly, on September 25, 1987, the district court entered an amended order resetting the case for jury trial on February 1, 1988, and extending the deadlines for completion of discovery and the filing of all motions to dismiss or motions for summary judgment to January 4, 1988.

On November 5, 1987, the defendants filed a motion for summary judgment and a motion to file a memorandum of law in excess of twenty pages in support of their motion for summary judgment. The district court notified the parties on November 30, 1987, that it would take the motion for summary judgment under advisement on December 28, 1987 and that no hearing would be held on the motion. The district court further stated that the parties could file documents in support of, or in opposition to, the motion until that date. *See* (R3–67).

The district court entered an order on December 11, 1987 denying the defendants' motion to file a memorandum of law in excess of twenty pages in support of their motion for summary judgment. The court advised the defendants that they had five days to file their memorandum not to exceed twenty pages, and that the plaintiff had fifteen days from the filing of the defendants' memorandum to respond. *See* (R3–69). On December 22, 1987, the parties stipulated to dismissal of ten of the twenty D.O.C. defendants. Thereafter, on December 23, 1987, the defendants filed their memorandum of law in support of their motion for summary judgment in compliance with the district court's order. The defendants supported their motion with affidavits denying the plaintiff's allegations.

On January 7, 1988, Barfield filed a motion to stay consideration of the summary judgment pending further discovery pursuant to Fed.R.Civ.P. 56(f). He filed an affidavit in support of his motion explaining his need for additional discovery. *See* (R4–73, Ex. 2). Barfield also filed several discovery motions. The district court denied

his motion to stay summary judgment, as well as his other discovery motions, on January 12, 1988. In the same order, the district court permitted Barfield until January 20, 1988 to respond to the defendants' motion for summary judgment, stating that it would grant no further extensions of time in the matter. *See* (R4–83).

On January 20, 1988, noting that the plaintiff failed to timely respond to the defendants' motion for summary judgment, the district court entered judgment for the defendants. *See* (R4–84). The court, however, reached the merits of the motion in its order granting summary judgment. It held that Barfield's constitutional rights were not violated by the defendants' actions in transferring him to Florida State Prison. The court reasoned that as a convicted prisoner, Barfield possessed no constitutional right to remain in any one particular correctional facility over another. (R4–84–3). The court stated that the evidence in the record showed that Barfield was transferred for valid, administrative reasons. *Id.* The court also held that the defendants' affidavits refuted the plaintiff's allegations that he was denied access to the courts or to communication with the outside world. *Id.* at 4. Additionally, the court concluded that the evidence presented showed that Barfield was not denied medical care and treatment while at Florida State Prison. *Id.* at 6–7. The court found that the plaintiff failed to establish deliberate indifference by the prison officials to his medical needs, and that the plaintiff had received adequate ongoing medical care. *Id.*

On January 22, 1988, two days after the deadline set by the district court, the plaintiff filed his memorandum in opposition to the defendants' motion for summary judgment with his supporting affidavit and exhibits. *See* (4–90). In his motion, the plaintiff specified the actions by the D.O.C. officials which, he argues, violated his constitutional rights. The plaintiff also filed a motion to vacate the summary judgment order on January 28, 1988 which the district court denied on February 11, 1988. *See* (R4–93). In footnote two of that order, the district court stated that it had con-

sidered the merits of the plaintiff's belated response in opposition to the defendants' summary judgment motion, but that it still would have granted the defendants' motion notwithstanding the response. On February 19, 1988, the plaintiff filed his notice of appeal contesting the entry of the summary judgment. *See* (R4–94).

Barfield raises two issues on appeal. First, he argues that the district court's order denying his motion to stay consideration of the defendant's summary judgment motion was an abuse of discretion. He claims that he made a diligent effort to pursue discovery in this case, but due to his status as a pro se incarcerated litigant, and the defendants' claims of privilege, he faced unique problems in his efforts to gain access to proof to rebut the defendants' motion for summary judgment within the time parameters established by the district court. Further, he states that he complied strictly with the mandates of Rule 56(f) by setting forth the facts inhibiting his discovery efforts and by identifying with particularity the discovery he sought which would demonstrate the existence of genuine issues of material fact.

Second, Barfield claims that the district court erred in granting the defendants' summary judgment motion because the evidence he presented in opposition raised genuine issues of material fact. He states that his affidavit explicitly controverts the defendants' assertions that he possessed no liberty interest as a youthful offender to remain free from incarceration in adult facilities, and that his D.O.C. Youthful Offender Declaration supports his status as such. Barfield also argues that his affidavit and deposition testimony contradict the defendants' statements that he was not denied meaningful access to the courts or denied adequate medical treatment. Thus, since such material issues of fact exist, he states, summary judgment was improperly granted. We review each issue in turn.

## III. MOTION TO STAY SUMMARY JUDGMENT

■ In support of the district court's denial of the plaintiff's motion to stay the

entry of summary judgment, the defendants first argue that this court lacks jurisdiction to consider the district court's order regarding the stay. The defendants maintain that the issue is time barred pursuant to Fed.R.App.P. 4(a)(1)[4] and that the plaintiff failed to preserve the issue for appeal pursuant to Fed.R.App.P. 3(c).[5] Thus, the defendants claim that Barfield's attempt to raise this issue for the first time in his initial brief before this court must be precluded. This argument is without merit.

The plaintiff's notice of appeal states:

Plaintiff, MICHAEL A. BARFIELD, hereby gives notice of his intent to appeal a final order in the above-styled cause to the Eleventh Circuit Court of Appeals. The nature of the order is a final order granting summary judgment for the defendants rendered on January 20, 1988.

(R4–94). It is true that in some instances "[w]here the appellant notices the appeal of a specified judgment only or a part thereof, ... [an appellate] court has no jurisdiction to review other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal." *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1056 (5th Cir. July 1981).[6] However, jurisdiction is restricted in this way in only certain limited situations. When an order disposes of two separate motions on two separate issues and the "express mention in the notice of appeal of one part of the order negate[s] any inference of intent to appeal from the order

as a whole," the appellate court has no jurisdiction. *Id.*[7] Such a situation does not exist in this case. The plaintiff seeks review of the entire final judgment which implicates all non-final orders preceding it, including the stay.

The United States Supreme Court addressed this issue in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In that case, the Court reversed the dismissal of the petitioner's appeal because of her failure to specify in the notice of appeal that she sought review of the original judgment as well as the district court's denial of her motions to vacate the judgment and amend the complaint. The Court found:

It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities. 'The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.'

*Id.* at 181–182, 83 S.Ct. at 229–230 (quoting *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). Moreover, except in certain types of cases, this circuit has recognized that since only a final judgment or order is appealable,[8] the appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment. *Jones v. Preuit & Mauldin*, 808 F.2d 1435, 1438 n. 1 (11th

---

**4.** Fed.R.App.P. 4(a)(1) provides, in pertinent part:

In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from;....

**5.** Fed.R.App.P. 3(c) provides, in pertinent part: The notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment, order or part thereof appealed from; and shall name the court to which the appeal is taken.

**6.** The Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981),

adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**7.** In *C.A. May Marine*, the appellate court held that it lacked jurisdiction to review the trial court's denial of attorney fees where the appellant's notice of appeal designated an appeal only from the denial of a motion for a new trial rendered in the same order. *Id.*

**8.** By statutory authority, this court has jurisdiction only of appeals from final decisions of the district courts. The statutory grant of appellate jurisdiction originates in 28 U.S.C. § 1291 (Supp.1988) and provides:

The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States....

Cir.1987) (when reviewing an appeal from a final judgment, this court can review rulings on previous interlocutory orders).

■ Barfield filed his notice of appeal from the final judgment of the district court granting summary judgment for the defendants. Since this court usually cannot hear appeals from non-final orders, "even from fully consummated decisions when they are but steps towards a final judgment into which they merge," *Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1530 (11th Cir.1987), review of the final judgment opens for consideration the prior interlocutory orders.[9] The final summary judgment in this case therefore, draws into question the district court order denying the plaintiff's motion to stay because that order was interlocutory in nature. Consequently, we find that this court has jurisdiction to review, for an abuse of discretion, the district court's order denying the plaintiff's motion to stay consideration of the defendants' summary judgment motion.

Turning to the merits of the plaintiff's claim, the defendants contend that the district court did not abuse its discretion in denying Barfield's motion to stay summary judgment because Barfield failed to diligently prosecute the case and therefore, improperly invoked the provisions of Fed. R.Civ.P. 56(f). The defendants claim that the district court warned Barfield numerous times of the necessity of responding to their motion for summary judgment, yet his only response involved a request for a continuance from the district court. Thus, they argue that denial of the stay was proper.

■ Rule 56(f) provides:

When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The availability of a continuance is built into the rules to guard against the premature entry of summary judgment. "Subsection (f) allows a party who 'has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof.'" *Wallace v. Brownell Pontiac–GMC Co.*, 703 F.2d 525, 527 (11th Cir.1983) (quoting 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2740 at 530 (2d ed.1983)).

■ A party requesting a continuance under this rule must present an affidavit containing specific facts explaining his failure to respond to the adverse party's motion for summary judgment via counter affidavits establishing genuine issues of material fact for trial. *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 900 (5th Cir.1980), *cert. denied*, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981). "The nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts," but must show the court how the stay will operate to permit him to rebut, through discovery, the movant's contentions. *Id.* at 901. The grant or denial of a continuance is within the sound discretion of the trial court. *Id.; Wallace*, 703 F.2d at 527; *Walters v. City of Ocean Springs*, 626 F.2d 1317, 1321 (5th Cir.1980).

■ We must consider the record to determine whether the trial court abused its discretion in denying the plaintiff's motion to stay summary judgment. Barfield filed his motion to stay summary judgment, with his affidavit, on January 7, 1988, three days after the district court's filing deadline for all motions to dismiss and motions for summary judgment. Although the

---

9. *See Aaro, Inc. v. Daewoo Int'l (America) Corp.*, 755 F.2d 1398, 1400 (11th Cir.1985) (summary judgment order which failed to resolve all claims asserted by the parties is interlocutory in nature and open to review on appeal from final judgment); *Monarch Asphalt Sales Co. v. Wilshire Oil Co.*, 511 F.2d 1073, 1077 (10th Cir.1975) (interlocutory orders from which no appeal lies are merged into the final judgment and open to review on appeal from that judgment).

court denied the motion on January 12, 1988, it apparently did not do so on the grounds of untimeliness. *See* (R4–83). The court did, however, direct the plaintiff to respond to the defendants' motion by January 20, 1988.

In his affidavit supporting the motion to stay, Barfield argued that, as a pro se incarcerated plaintiff, he was handicapped in his discovery efforts. He stated that the defendants' claims of privilege to D.O.C. documents, along with his inability to obtain private counsel, necessitated the stay. He claimed that the material he needed to rebut sufficiently the defendants' motion for summary judgment was in their sole possession. Barfield explained that he would need to depose several of the defendants and other D.O.C. officials, as well as propound additional interrogatories and requests to produce on them, to obtain such information. Additionally, Barfield said that he delayed in seeking further discovery from mid-September to January because he was waiting to determine if private counsel would handle his case.

 Although these facts indicate that Barfield complied with the technical requirements of Rule 56(f), we hold that the district court did not abuse its discretion in denying the continuance. If the district court is dissatisfied with the nonmovant's explanations as to why he cannot rebut the movant's motion for summary judgment, it may refuse to stay consideration of the motion. *See Wallace*, 703 F.2d at 527. The district court did not detail the basis of its denial of the stay. However, the record supports the court's conclusion and we therefore, are precluded from interfering with the exercise of its discretion. *See Walters*, 626 F.2d at 1321.

Several aspects of the record indicate that the plaintiff had ample time and opportunity for discovery, yet failed to diligently pursue his options. This case has been pending since September 1986. Two different trial dates have been set since then; one in November 1987, and the other in February 1988. Concurrent with the two trial dates were two discovery cut-off dates, the latest being January 4, 1988. Although we note that the plaintiff was not entirely responsible for these delays in the litigation, the district court, nevertheless, informed the plaintiff on three occasions of the need to conduct discovery and respond to the defendants' motion for summary judgment.[10] Further, the defendants' first motion for summary judgment has been pending since November 5, 1987, as well as their discovery documents in support of their motion, since November 13, 1987. Thus, the plaintiff was well aware of the importance of obtaining discovery prior to trial.

Barfield also made numerous discovery requests in the initial stages of litigation to which the defendants responded, but later failed to pursue further discovery or request the court's assistance in obtaining it until three days after the court's discovery deadline expired. He claims that he delayed in obtaining more discovery pending word from private counsel as to whether they would represent him. We recognize that courts must be sensitive to the special problems faced by prisoners proceeding pro se in vindicating their constitutional rights, and that such pro se inmates "occupy a position significantly different from that occupied by litigants represented by counsel." *Moore v. Florida*, 703 F.2d 516, 520 (11th Cir.1983); *see also Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir.1985). However, we conclude from the facts of this case that the trial judge gave Barfield, as an incarcerated pro se plaintiff, ample notice that discovery was necessary, and permitted him several opportunities to conduct it so that his rights would not be extinguished simply from his failure to ap-

---

**10.** The district court first notified the parties on November 30, 1987 that it would consider the defendants' motion for summary judgment on December 28, 1987, and that the parties could file discovery documents in support of their positions until that date. *See* (R3–67). On December 11, 1987, the court again informed the plaintiff that he had fifteen days from the filing date of the defendants' twenty page memorandum in support of their summary judgment motion to file his response. *See* (R3–69). Finally, on January 12, 1988, the court ordered the plaintiff to respond to the summary judgment motion by January 20, 1988. *See* (R4–83).

preciate the subtleties of trial practice. *See Griffith*, 772 F.2d at 825.

In further support of his motion to stay, Barfield's affidavit attached to the motion outlined how the defendants' deposition testimony would aid him in establishing the material facts of his case. We note that "[t]he parties' comparative access to the witnesses or material relevant to the disposition of the rule 56(f) motion is a particularly salient factor for the trial court to consider in exercising its discretion." *Walters*, 626 F.2d at 1321. Here, both parties had access to the relevant witnesses. The plaintiff was aware of the identities of those witnesses critical to his case for over ten months, yet failed to depose or otherwise obtain their testimony in that time.[11] Considering these facts, we refuse to disturb the district court's determination that Barfield's explanations for his inability to meet the defendants' summary judgment motion were inadequate to support the continuance. Thus, based on our review of the record, we cannot conclude that the district court's denial of the plaintiff's request to stay consideration of the summary judgment motion constitutes an abuse of discretion. We therefore, affirm the district court on this issue.

## IV. ORDER GRANTING SUMMARY JUDGMENT

Barfield next contends that the district court erred in entering summary judgment for the defendants. He argues that he presented genuine issues of material fact regarding his liberty interest as a youthful offender in remaining incarcerated at youthful offender facilities, his right to meaningful access to the courts and to outside communication, and his constitutional right under the eighth amendment to remain free from cruel and unusual punishment from the D.O.C. officials' deliberate indifference to his medical needs. The defendants, however, maintain that the court properly entered summary judgment in their favor since the plaintiff failed to refute the evidence presented in their motion for summary judgment.

Consideration of the district court's grant of summary judgment requires plenary review and application of the same legal standards that bound the district court. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1527 (11th Cir.1987). Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987). The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof. *Everett*, 833 F.2d at 1510.

Summary judgment is improper "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to

---

**11.** The record indicates that the plaintiff filed one notice of taking depositions on June 9, 1987, *see* (R1–42), which he cancelled on June 15, 1987, *see* (R1–44). Although we recognize that an incarcerated pro se plaintiff faces a more difficult task in obtaining the testimony of witnesses in a civil trial than do other parties represented by counsel, such an undertaking is not insurmountable. One alternative to deposition testimony involves moving the district court to interview the witnesses. Barfield never made such a motion. " 'The most common situation in which [rule 56(f) ] will not be applied to aid a nondiligent party arises when the nonmovant has complied with Rule 56(f) but has failed to make use of the various discovery mechanisms that are at his disposal or seeks a continuance of the motion for that purpose.' " *Walters*, 626 F.2d at 1322 (quoting 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2740 at 726 (1973)).

grant summary judgment. *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). In this case, we view the evidence produced by Barfield, the nonmoving party, and all factual inferences arising from it, in the light most favorable to him. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Everett,* 833 F.2d at 1510; *Barnes v. Southwest Forest Indus., Inc.,* 814 F.2d 607, 609 (11th Cir.1987). However, Fed.R. Civ.P. 56(e) requires that when a motion for summary judgment is made and supported according to the rule, the nonmoving party's response must set forth specific facts showing a genuine issue for trial. If the party's response consists of nothing more than a repetition of his conclusory allegations, the district court must enter summary judgment in the moving party's favor. *Morris v. Ross,* 663 F.2d 1032, 1034 (11th Cir.1981), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982).

◼ As a preliminary matter, the defendants argue that the plaintiff wholly failed to respond to their motion for summary judgment and therefore, the district court correctly entered judgment in their favor. On the contrary, the plaintiff filed his memorandum in opposition to the defendants' motion with his supporting affidavit and exhibits on January 22, 1988. Although we note that this date was two days after the deadline set by the district court for consideration of the summary judgment motion, the court nevertheless, considered the plaintiff's memorandum and evidence in opposition.[12] We construe this action by the district court as entertaining the plaintiff's response on the merits, and thus, review the record in light of the plaintiff's memorandum, and its supporting documentation, opposing the defendants' summary judgment motion.

◼ To prevail in a civil rights action under 42 U.S.C. § 1983 [13] a plaintiff must show that the defendant, under color of state law, deprived the plaintiff of a right secured by the Constitution and laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct.1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Everett,* 833 F.2d at 1510; *Dollar v. Haralson County,* 704 F.2d 1540, 1542–43 (11th Cir.), *cert. denied,* 464 U.S. 963, 104 S.Ct. 399, 78 L.Ed.2d 341 (1983). Section 1983 alone creates no substantive rights; rather it provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws. *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979); *Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030, 1032 (11th Cir.1987). An underlying constitutional right must exist before a § 1983 action will lie. *Wideman,* 826 F.2d at 1032. Accordingly, our inquiry initially focuses upon the nature of the plaintiff's constitutional rights allegedly deprived by the defendants. *Baker,* 443 U.S. at 140, 99 S.Ct. at 2692.

### A. Liberty Interest as a Youthful Offender

Barfield claims that by virtue of his status as a youthful offender, he possessed a constitutional liberty interest in remaining at youthful offender institutions. He asserts that this right was violated when the D.O.C. defendants transferred him to Florida State Prison, a maximum security pris-

---

**12.** Footnote two of the district court's order denying the plaintiff's motion to vacate summary judgment states:

> [T]he court has reviewed the Plaintiff's belated Response to the Defendants' Motion for Summary Judgment, and concludes that the Motion for Summary Judgment would have been granted even if the Court had the benefit of the Plaintiff's Response prior to entering the Order granting summary judgment to the Defendants.

(R4–93–5, n. 2).

**13.** Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (1982).

on, without affording him due process of law. The defendants, however, argue that Barfield was merely classified as a youthful offender by the D.O.C., and that the classification created no liberty interest entitling Barfield to remain at a youthful offender facility.[14] Further, they claim that Barfield presented no evidence showing any issues of material fact for trial as to his youthful offender status, and thus, summary judgment was proper.

In determining whether Barfield possessed a liberty interest in remaining at a youthful offender institution, we recognize that liberty interests protected by the fourteenth amendment may arise either from the Constitution itself, or from state law. *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). The type of interest protected by the Constitution must rise to more than just an abstract need; rather the person claiming such a liberty interest must establish a legitimate claim of entitlement to it. *Kentucky Dep't of Corrections v. Thompson*, — U.S. —, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). To assert a state-created entitlement to a liberty interest, a party must show that the state placed "substantive limitations on official discretion." *Olim v.*

*Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983).

Past Supreme Court decisions suggest "that the most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decisionmaking, ... and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Thompson*, — U.S. at —, 109 S.Ct. at 1909. (citation omitted). If the liberty interest does not arise directly from the due process clause itself, the court must consider the statutes or other rules or directives defining the obligations of the authority controlling the exercise of the liberty interest to ascertain its origin. *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981). The regulations of the governing body must contain sufficiently explicit mandatory language requiring a specific outcome given the existence of the substantive predicates. *Thompson*, — U.S. at —, 109 S.Ct. at 1910.

In this case, the plaintiff points to three sources to establish the existence of his liberty interest: Fla.Stat. § 958.11;[15] Fla.Admin.Code Ann. r. 33–6.009;[16] and

---

**14.** We note that the defendants admitted at oral argument that they thought it likely that were Barfield *sentenced* as a youthful offender, he may indeed, have a liberty interest in remaining at a youthful offender facility.

**15.** Section 958.11, in effect at the time of the plaintiff's transfer to Florida State Prison provides, in pertinent part:

(2) [Y]outhful offender facilities and programs shall be used only for youthful offenders, and such youthful offenders shall be segregated from other offenders.

Fla.Stat. § 958.11 (1985).

**16.** The pertinent sections of the Fla.Admin.Code Ann., in effect as of the date of Barfield's transfer, provide:

(3) Housing Assignments.
(a) To the extent possible, and subject to the provisions of subsection (3), an inmate shall be assigned to a facility that can provide appropriate security and supervision, that can meet the identified needs of the inmate for programs and medical and dental attention, and, where possible, that is near the location of the inmate's family.

(b) *Inmates who have been committed under the Youthful Offender Act shall not be committed to non-youthful offender institutions.* Inmates 20 years of age or younger shall not routinely be assigned to non-youthful offender institutions. However, in selected cases, when the facts justify such action, youthful offenders not sentenced under the Youthful Offender Act may be considered for placement at non-youthful offender institutions. In such cases, written justification for such assignment must be given in the Progress Report. It should be specifically pointed out that the Classification Team is aware that the inmate is a youthful offender and that an exception to assignment is requested with the facts supporting the request listed as well as the recommended location. Receiving locations are also responsible for reviewing these individuals upon arrival; and, if the facts of the case are such that assignment to that new permanent location appears questionable, further coordination with the Population Movement and Control Administrator is warranted on the part of the receiving institution. Once youthful offenders are received at non-youthful offender institutions, it is incumbent upon the staff to continuously review those cases for con-

D.O.C. Policy and Procedure Directive No. 4.03.13.[17] These statutes, regulations and directives do appear to provide certain substantive predicates to guide the D.O.C. in its transfer of youthful offender inmates from one institution to another. *See e.g., Thompson*, —— U.S. at ——–——, 109 S.Ct. at 1910–1911. The rules include mandatory language requiring that the D.O.C. officials provide full and complete documentation of the reasons for the transfer, as well as a review of available alternate programs, and the submission of a transfer request form before the transfer will be granted. The effect of these rules is that an inmate can reasonably form an objective expectation that if he is sentenced, or perhaps even classified,[18] under these regulations, then he will remain incarcerated in a youthful offender facility. *See id.* at ——, 109 S.Ct. at 1911.

■■■ The situation in the present case differs from that in the usual case concerning the rights of inmates in the prison setting. Generally, "[custodial] officials have broad administrative and discretionary authority over the institutions they manage and ... incarcerated persons retain only a narrow range of protected liberty interests." *Hewitt*, 459 U.S. at 467, 103 S.Ct. at 869. Moreover, inmates usually possess no constitutional right to be housed at one prison over another. *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Accordingly, the Supreme Court has found no constitutionally based liberty interest in the involuntary transfer of a prisoner to a different facility. *See Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

In contrast, this case concerns the status of youthful offenders in the state correctional system, as opposed to the status of adult offenders regarding their transfers. The rules and procedures established by

---

sideration for recommending transfer to a youthful offender institution. Such a transfer shall be recommended as soon as the facts of the case suggest movement would be in order....

Fla.Admin.Code Ann. r. 33–6.009 (1982) (emphasis supplied). This section was amended in October 1983 to provide for certain exceptions to the mandate against the transfer of youthful offenders to adult facilities. However, these exceptions did not apply to Barfield's transfer to Florida State Prison; nor would they have affected his rights in any event.

17. D.O.C. Directive No. 4.03.13, in effect during Barfield's transfer, is entitled Transfer and Movement of Inmates. It reads, in relevant part:

I. Youthful Offender Transfers
\* \* \* \* \* \*
2. Inmates committed by the courts under the Youthful Offender Act 75 Chapter 958 shall be assigned to a Youthful Offender Institution.
\* \* \* \* \* \*
4. Youthful Offenders who are not committed under the Youthful Offender Act Chapter 958 but have been designated as a Youthful Offender by the Department can be administratively assigned to a Youthful Offender Institution.
5. Valid justification and documented reasons have to be made when requesting transfer of both classes of the Youthful Offender inmate to another Youthful Offender Institution. Each of the Youthful Offender Institutions need to use all resources and programs available within their institution before recommending a trans-

fer to a higher level Youthful Offender Institution.
6. When these youthful offenders sentenced under the Youthful Offender Act or designated a Youthful Offender by the Department can no longer be contained or successfully programmed in one of the Youthful Offender Institutions, a review must be made of all available alternative programs before requesting transfer of the inmate to an adult facility. Transfers from Youthful Offender Institutions should be coordinated with (1) the Population Movement and Control Coordinator, (2) the Youthful Offender program Office and (3) the Adult Services Program Office. The same coordination efforts should exist in continuously screening adult institutions for inmates who, by virtue of age, might be better placed in one of the youthful offender institutions. Full and complete documentation and substantiation of these transfer requests are required before approval can be granted (See Sample Youthful Offender Review Form [# DC4–321]).

18. Barfield contends that even if he were not sentenced as a youthful offender, but merely classified as such by the D.O.C., he would still possess a liberty interest in remaining at a youthful offender institution. The rules and directives governing the transfer of youthful offender inmates classified by the D.O.C. do require certain procedures that curtail those officials' discretion. However, we do not reach that argument since the plaintiff has raised a genuine issue as to whether he was sentenced as a youthful offender, and whether that status created, in him, a liberty interest.

the State of Florida in this case indicate that it has created a liberty interest in sentenced youthful offenders in remaining incarcerated at youthful offender facilities. *Cf. Whitehorn v. Harrelson,* 758 F.2d 1416 (11th Cir.1985) (fact issue exists regarding whether state regulations created liberty interest in incarcerated prisoner's continued participation in work release program). The plaintiff has sufficiently alleged that the D.O.C. officials' discretion is limited regarding youthful offenders in that they are wholly prohibited from transferring sentenced youthful offenders to adult institutions. Once the D.O.C. officials determine that an inmate is a sentenced youthful offender, they are mandated to comply with the established directives for transferring them.[19] Thus, since we find that a state-created liberty interest may exist here, we must consider whether the plaintiff has presented sufficient evidence to create a genuine issue of material fact regarding his transfer.

The record reflects that there is a genuine factual issue in this regard. Barfield states in his affidavit opposing summary judgment that he was sentenced by a state circuit court judge as a youthful offender. (R4–90, Ex. A, p. 2). This statement directly refutes the defendants' claims that Barfield was not sentenced as a youthful offender. *See* (R3–72, Ex. A, p. 6; Ex. C p. 2). Barfield also submitted his Youthful Offender Declaration which indicates that his status as a classified youthful offender was never removed by the D.O.C. pursuant to its rules and regulations. While the defendants make a blanket assertion that the designation was removed while Barfield was at Cross City, there is no indication of this in the record. In addition, Barfield presented the affidavit of his former attorney confirming that Barfield's

prison record fails to show that his youthful offender status was ever removed. *See* (R4–90, Ex. D). Finally, Brierton admitted in his deposition that youthful offenders cannot be transferred to adult facilities "by rule," indicating at least his recognition of the distinctions in status. *See* (R3–72, Ex. 3, p. 47–48). Given these facts, we find that the plaintiff has established a genuine issue of material fact as to whether he possessed a liberty interest as a youthful offender, and whether that interest was violated by the D.O.C.'s actions in transferring him to an adult facility. This precludes the entry of summary judgment as a matter of law.

### B. Access to Courts

■ The plaintiff next contends that he was denied meaningful access to the courts and to outside communication while incarcerated at Florida State Prison. This claim pertains only to the time he spent at the state prison. The plaintiff states that he was wholly denied any right of access to the courts whatsoever. The defendants deny these allegations and argue that the plaintiff's rights were never abridged.

The Supreme Court has recognized that a prisoner has a fundamental right under the Constitution to access to the courts. *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). This right cannot be impaired by prison officials. *Id.* at 828, 97 S.Ct. at 1498. "[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.; see Wolff v.*

**19.** The defendants contend that section III of the D.O.C. Policy and Procedure Directive No. 4.03.13 permits prison inspectors to "authorize transfers [of inmates] in cases of an emergency or other unusual circumstances," and therefore, Inspector Brierton had the authority to transfer Barfield to Florida State Prison pursuant to the FBI's request. Prison inspectors must insure that "all the rules and regulations issued by the department are strictly observed and followed by all persons connected with the correctional

systems of the state." Fla.Stat. § 944.31 (1985). These directives imply that Brierton had to exercise his discretion in accord with established D.O.C. rules and regulations, even those governing the transfer of youthful offenders. In any event, Barfield challenges, in his affidavit opposing summary judgment, the propriety of Brieton's actions stemming from the FBI's statements. This raises a genuine issue of material fact precluding summary judgment.

*McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Our examination of the record reveals several points of factual dispute between the parties raising a genuine issue regarding whether the plaintiff was denied access to the courts. While Barfield admits that he had access to the courts after his incarceration at Florida State Prison and that he filed several legal documents with the district court, he asserts in his affidavit opposing summary judgment that his requests for legal materials and for use of the law library and United States mail service were summarily denied by the D.O.C. officials at the state prison.[20] Barfield's deposition raises the same factual disputes. *See* (R4–90, Ex. F, pp. 46–47 of 12/11/87 depo.). The plaintiff also pointed to the deposition testimony of Brierton to establish that the D.O.C. officials acted to completely cut off his communication.[21]

The defendants presented affidavits denying that they restricted Barfield from access to the courts. Defendants Brierton, Dugger, Watson, Barton, Music and Bigham each filed affidavits attached to their motion for summary judgment. *See* (R3–72, Ex. A; G; H; I; J; and K). The plaintiff's and the defendants' affidavits and testimony are in direct conflict. Thus, we find that a genuine issue of material fact exists as to whether Barfield's ability to communicate with the courts and legal counsel, and to utilize the law library was abridged while he was at Florida State Prison.

### C. Medical Attention

Finally, Barfield argues that the district court erred in granting summary judgment for the defendants on his claim of cruel and unusual punishment under the eight amendment. Barfield states that while he was incarcerated at Florida State Prison, he was taunted, threatened, and physically and sexually assaulted. He asserts that he informed several prison officials that he was being repeatedly attacked by an inmate who had access to his cell with a key. Additionally, he maintains that several D.O.C. officials personally harassed and abused him. The defendants presented affidavits denying the plaintiff's allegations. They assert that the plaintiff was never assaulted or denied medical attention. The defendants argue that Barfield failed to present evidence that the D.O.C. officials acted with conscious or callous indifference to his serious medical needs, and therefore, the district court properly entered summary judgment in their favor.

For a prisoner to maintain a § 1983 action for a violation of the prohibition against cruel and unusual punishment, he must show that he was punished by the unnecessary and wanton infliction of pain. *See Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976); *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Deliberate indifference to a prisoner's serious medical needs constitutes such wanton infliction of pain. *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). The requisite deliberate indifference may be established by a showing that prison doctors or prison guards intentionally denied or delayed access to medical care requested by a prisoner. *Id.* However, inadvertent or negligent conduct in diagnosing or treating a medical condition will not state a constitutional violation merely because the victim is a prisoner. *Id.* at 106, 97 S.Ct. at 292.

Review of the record indicates that the plaintiff has presented sufficient evidence of a genuine issue of fact regarding

---

20. Barfield states in his affidavit:

"I requested defendant WATSON on numerous occasions to make a telephone call, to mail articles of mail to family, friends, the courts and my attorney, Mr. Wade Griffin, Esquire. I also requested defendant WATSON to allow me access to the prison law library or materials from the law library on at least four separate occasions while I was at FSP."

Barfield also stated in his affidavit that he submitted many legal documents, as well as personal letters, to Watson for mailing but later learned that the documents never reached their destination. *See also* (R4–90, Ex. G). Barfield was never authorized to make phone calls to his attorney despite repeated requests to defendants Watson, Barton and Music. (R4–90, Ex. A, p. 4).

21. Brierton's deposition states:

"I explained to Richard [Dugger, superintendent of Florida State Prison] that we had a case of national security.... [W]e didn't want him contacting—that the agents did not want him contacting people from the outside." (R3–72, Ex. 3, p. 20).

Brierton further testified that "I can't say for sure, but I can say that [the agents] did not want [Barfield] to have contact with people by—to whom he could pass the information.... My understanding *in toto* of the conversation that I had with the two gentlemen was that they wanted this man not to have contact with anyone for a specified period of time so that no information could be passed." *Id.* at 70–71.

whether the defendants deliberately denied him medical treatment subsequent to his assaults. Barfield testified in his deposition as to the facts surrounding his incarceration at Florida State Prison. *See* (R4–90, Ex. F, pp. 79–150 of 12/4/87 depo.). He details the events that occurred while on Q Wing. On several occasions, the prison officials monitoring his cell would taunt Barfield saying that he was scheduled to be electrocuted in the electric chair. They flickered the lights on and off in his cell. They staged a mock attempt to have his head shaved for electrocution. They even physically assaulted him when he refused to submit to their attempt to escort him to the barber.

Barfield also gave the details of the sexual assaults at his deposition. *See* (R4–90, Ex. F, pp. 107–111 of 12/4/87 depo.). He explained that an inmate entered his cell with a key under the pretext of cleaning it, and then violently beat him and raped him. Barfield states he yelled for help but no guards came to his assistance. He said that he told a lieutenant at the prison that he had been assaulted and that he wished to go to the medical unit. According to Barfield, the official answered that "everybody has got problems," and he was never taken to the infirmary. *Id.* at 113. Subsequent requests to report the incidents to other prison officials or to go to the infirmary met with denials and silence on the part of the D.O.C. After later assaults, Barfield stopped trying to seek help because he felt that the attempts were "futile" and "that everybody I told about it up until then seemed as if nothing happened." *Id.* at 115. Several days after the later incidents, Barfield spoke with the defendant Watson who denied his request to go to the medical unit. Barfield stated that Watson said that he did not believe that Barfield had been sexually assaulted. *Id.* at 116.

The defendants' affidavits directly contradict the plaintiff's claims. They assert that the plaintiff received ongoing medical care at the prison because a medical technician made daily rounds on Q Wing and, had the plaintiff needed medical care, it would have been provided. The defendants also state that since Barfield was housed in a cell in the infirmary for the last month that he was at the prison, then he was within easy access to medical treatment.

We find that the evidence presented in the affidavits and depositions show a clear dispute over the material facts of this case. Barfield has sufficiently met the defendants' contentions that they never denied him his constitutional rights to be free from cruel and unusual punishment. He has set forth facts showing that the D.O.C. officials may have acted with deliberate indifference to his medical needs after the assaults, as required under the eighth amendment. We therefore, reverse the district court's grant of summary judgment for the defendants.

## V. CONCLUSION

We conclude that this court has jurisdiction to review the district court's denial of the plaintiff's motion to stay consideration of the summary judgment motion. We hold, however, that the court did not abuse its discretion in denying the stay. This court also finds that the evidence presented, viewed in the light most favorable to the plaintiff, shows that there are genuine issues of material fact relevant to the existence of a liberty interest in the plaintiff as a youthful offender. Moreover, the plaintiff has established genuine issues regarding whether the defendants transferred him in violation of his liberty interest as a youthful offender, whether they unconstitutionally denied him the fundamental right of access to the courts, and whether they deliberately denied him medical treatment in violation of the eighth amendment. As always, we indicate no opinion as to whether or not these claims are valid or will be sustained, but only that a trial is necessary for a proper resolution. Accordingly, we REVERSE the summary judgment entered by the district court and REMAND for further proceedings consistent with this opinion.